**FILED**
**OCT 17 2019**
**U.S. CLERK'S OFFICE**
**INDIANAPOLIS, INDIANA**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES and STATE OF INDIANA *ex rel.* [Under Seal], | Case No. [Under Seal] |
| Plaintiffs/Relator, | **COMPLAINT** |
| v. | Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2) |
| [Under Seal], | DO NOT SERVE OR POST ON PACER |
| Defendant. | |

## 1:19-cv-4258 JRS-DML

Filed by:

Robert E. Saint, Esq.
Of counsel:
EMSWILLER, WILLIAMS, NOLAND & CLARKE, LLC
8500 Keystone Crossing, Suite 500
Indianapolis, IN 46240
Phone: 317-475-8787
Fax:     317-257-9042
Email: rsaint@ewnc-law.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
OCT 17 2019
U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

| | | |
|---|---|---|
| UNITED STATES and STATE OF INDIANA ex rel. JUDITH ROBINSON, | : | Case No. |
| Plaintiffs/Relator, | : : | **COMPLAINT** |
| v. | : : | Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2) |
| HEALTHNET, INC., | : : | DO NOT SERVE OR POST ON PACER |
| Defendant. | : | 1:19-cv-4258-JRS-DML |

**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT AND THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT**

This is an action brought by Plaintiff/Relator Judith Robinson, M.D., on behalf of the United States of America and the State of Indiana pursuant to the Federal False Claims Act, 31 U.S.C. § 3729, et seq., and the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-1, et seq. In support thereof, Relator alleges as follows:

### INTRODUCTION

1. High-risk, low-income pregnant women in Indianapolis, Indiana, rely on the HealthNet clinics. HealthNet, Inc. is a federally funded primary health care facility, which serves the low-income indigent population in Marion County and the metropolitan area. This action is related to an original action entitled, *United States of America and State of Indiana, ex. rel. Judith Robinson, M.D. v. HealthNet, Inc.*, Case No. 1:13-CV-2009-TWP-MJD. This action addresses the false the false FQHC wrap-around billings which were dismissed without prejudice.

2

## JURISDICTION AND VENUE

2. This action arises under the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-1, *et seq.* This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730. Additionally, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court for state-law claims that arise under the same transactions or occurrences as an action brought under 31 U.S.C. § 3730.

3. This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because the Defendant can be found in, reside in, transact business in, and have committed the alleged acts in Marion County, Indiana, which is in the Southern District of Indiana.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1392(b)-(c) and 31 U.S.C. § 3732(a) because the Defendant can be found in, reside in, and transact business in the Southern District of Indiana and the alleged acts occurred in this District.

5. Relator knows of no other complaints that have been filed against the Defendant alleging the same or similar allegations. To Relator's knowledge, the facts and circumstances alleged in this Complaint have not been publicly disclosed in a federal criminal, civil or administrative hearing in which the Government or its agent is a party; in a Government Accountability Office or other federal report, hearing, audit, or investigation; or in the news media, except to the extent those issues were raised by the Relator originally in her previous cause of action in this Court under Case No.: 1:13-CV-2009-TWP-MJD (Original Action). On May 4, 2017, the original action was settled, except for the violations regarding the FQHC wrap-

around payments, as described herein, which claims were dismissed without prejudice, and subject to re-filing.

6. Relator is an original source as defined by the False Claims Act in 31 U.S.C. § 3730(e)(4)(B) and as described in the Indiana False Claims and Whistleblower Protection Act at Ind. Code 5-11-5.5-7(f), as detailed more fully herein. Relator has made voluntary disclosures to the United States of America and the State of Indiana prior to the filing of this lawsuit as required by 31 U.S.C. § 3730(b)(2).

## PARTIES

7. The real-parties-in-interest to the claims set forth herein are the United States of America and the State of Indiana.

8. **Plaintiff and Relator Judith Robinson, M.D.**, is a resident of Carmel, Indiana. She received her Doctor of Medicine from the University of Illinois in 1981 and performed her residency in Obstetrics and Gynecology at Methodist Hospital in Indianapolis, Indiana from 1983 to 1987. Dr. Robinson is a Board-certified Ob/Gyn and a Fellow in the American College of Obstetrics and Gynecology. Among her many honors, she has received the Indianapolis Monthly "Top Doc" award for Ob/Gyn physicians each month since 1998. Dr. Robinson had an active private practice for nineteen years, from 1987 until 2006.

9. Dr. Robinson began working part-time at HealthNet in or around October 2005. In or about mid-2006, Dr. Robinson left private practice completely and began working full time at HealthNet. At all times from 2005 until her termination in 2013, Dr. Robinson received her W-2 from IU Health (f/k/a Clarian Health Partners, Inc.) and was eligible to participate in IU Health's group health insurance plan, disability insurance plan, and qualified retirement plan. In

2010, Dr. Robinson was appointed to the position of Medical Director of Ob/Gyn Services at Methodist Hospital. She also held the position of Chairperson of Methodist Hospital Ob/Gyn Section and was the Manager of the HealthNet/IU Health Hospitalist Service. From 2010 through 2012, Dr. Robinson was also the Assistant Ob/Gyn Residency Director for the Methodist Hospital campus. In 2011, Dr. Robinson was appointed to the position of Director of Women's Services at HealthNet, Inc., which made her the first person to hold Director positions at both HealthNet and Methodist Hospital concurrently.

10. **Defendant HealthNet, Inc. ("HealthNet")** is a non-profit corporation which had nine primary care health centers and additional specialty clinic locations throughout metro Indianapolis, Indiana. HealthNet, Indiana's largest federally qualified health center, was established in 1968 and provides healthcare services primarily to patients who live at or below the federal poverty level. HealthNet provides these services, which include pediatrics, obstetrics, and gynecological services, on a sliding fee scale to those without insurance, but the bulk of its patients are Medicaid beneficiaries. The past President and CEO of HealthNet is J. Cornelius Brown and its Chief Medical Officer is Dr. Don Trainor, M.D. Today, the CEO of HealthNet is Rick Diaz.

11. According to HealthNet's 2012-2013 annual report, 4,077 women received prenatal care at HealthNet that year, including 2,422 deliveries at IU Health's Methodist Hospital. That report also identified that 61% of HealthNet's total patient population are Medicaid beneficiaries. Upon information and belief, approximately 90% of HealthNet's obstetric patients are Medicaid beneficiaries.

## LEGAL AND REGULATORY BACKGROUND

**Federal False Claims Act**

12. The False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (B), imposes liability upon, *inter alia*, those who knowingly present or cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim. Violators are liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages sustained by the Government. 31 U.S.C. § 3729(a)(1).

**Indiana Medicaid**

13. The federal Medicaid program was created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income persons, blind, disabled, or members of families with dependent children or qualified pregnant women or children. The Medicaid program is jointly financed by the federal and state governments. The Secretary of Health and Human Services administers Medicaid on the federal level through the Centers for Medicare and Medicaid Services ("CMS"). Within broad federal rules, each state decides eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The states directly pay providers, with the states obtaining the federal share of the payment from accounts which draw on the United States Treasury. 42 C.F.R. §§430.0-430.30. The federal share of Medicaid expenditures varies by state.

14. The Indiana Health Coverage Program ("IHCP"), Indiana's Medicaid program, is administered by the Indiana Family and Social Service Administration, an agency of the State of Indiana. It offers both fee-for-service and capitated managed care programs.

15. Healthcare providers who wish to provide and be paid for services to Medicaid beneficiaries must first become approved Medicaid providers. This applies to both individual providers and to institutional providers. To become an approved Medicaid provider, each provider must complete an enrollment packet with the IHCP. As part of that packet, each provider must execute a "Provider Agreement," which expressly includes the following statement, set in all capital letters immediately before the authorized signature line:

> AS A CONDITION OF PAYMENT AND CONTINUED ENROLLMENT IN THE IHCP, THE UNDERSIGNED, BEING THE PROVIDER OR HAVING THE SPECIFIC AUTHORITY TO BIND THE PROVIDER TO THE TERMS OF THIS AGREEMENT, AND HAVING READ THIS AGREEMENT AND UNDERSTANDING IT IN ITS ENTIRETY, DOES HEREBY AGREE TO ABIDE BY AND COMPLY WITH ALL THE STIPULATIONS, CONDITIONS, AND TERMS SET FORTH HEREIN.

16. Among the "stipulations, condition and terms set forth" in the agreement, compliance with which is specifically identified as a condition of payment, is the following: "To abide by the Indiana Health Coverage Programs Provider Manual, as amended from time to time, as well as all provider bulletins and notices."

17. In Indiana, Medicaid is funded approximately one-third by the State of Indiana and two-thirds by the federal government. For example, for FY2015, the federal government assistance percentage ("FMAP") for Indiana is 66.52%, meaning the state is responsible for the remaining 33.48%. The FMAPs from 2009 to the present are:

| Fiscal Year | FMAP | State Share |
|---|---|---|
| FY2008 | 62.69% | 37.31% |
| FY2009 | 74.21% | 25.79% |
| FY2010 | 75.69% | 27.31% |
| FY2011 | 66.52% | 33.48% |
| FY2012 | 66.96% | 33.04% |
| FY2013 | 67.16% | 32.84% |
| FY2014 | 66.92% | 33.08% |

### *Specific Indiana Medicaid Regulations Regarding the Use of Non-Physician Providers for High-Risk Obstetric Patients*

18. Indiana Medicaid plainly and unequivocally conditions the payment of public healthcare money for the treatment of medically high-risk pregnant women on the requirement that those women be treated *only* by physicians.

**Federally Qualified Health Centers**

19. A Federally Qualified Health Center ("FQHC") is a health center that receives federal funding under Section 330 of the Public Health Service Act to provide comprehensive primary care services to uninsured and underinsured populations. FQHCs have featured an increasingly prominent role in public health services since the 2010 Patient Protection and Affordable Care Act, because FQHCs have picked up much of the responsibility for treating underserved, low-income communities where there was the largest growth of newly-insured patients. FQHCs must serve an underserved area or population, offer a sliding fee scale, provide comprehensive services, have an on-going quality assurance program, and have a governing board of directors.

20. Approximately 22 states, including Indiana, offer "wrap-around" payments to compensate FQHCs for the difference between the negotiated health plan rates and the FQHC's cost-based rates. Wrap-around payments are paid by the state as supplements to certain approved Medicaid claims. In Indiana, wrap-around payments are made to an FQHC every 30 days, and reconciled at the year-end.

21. FQHCs require a provider to engage in a face-to-face meeting to generate a billable encounter that can generate an FQHC wrap-around payment. 42 C.F.R. 405.2463. In a 2011 Policy Report assessing the status of FQHC Medicaid Prospective Payment Systems

around the country, Indiana defined a "Billable Encounter (that can generate a payment at health center rate)" as "a face-to-face contact between a client and a provider of health care services who exercises independent judgment in the provision of health services to the individual client."[1].

## DEFENDANT'S WRONGFUL CONDUCT

22. Defendant's fraudulent conduct began or was already on-going in October 2013 when Dr. Robinson began working at HealthNet. Therefore, all claims submitted since 2005 to the present by HealthNet as part of the fraudulent schemes described herein are false claims.

**HealthNet submits for FQHC payments when the provider did not conduct a face-to-face encounter with the patient.**

23. CNMs are permitted by the scope of their licensure to order routine ultrasounds as part of the prenatal care of a normal pregnancy. However, it is beyond the scope of a CNMs licensure to review and interpret the results of an ultrasound.

24. HealthNet developed a system where all ultrasound images were gathered in a designated drawer or similar location within a HealthNet clinic. At the end of a shift, the Ob/Gyn physician would take the ultrasounds from the drawer, review each ultrasound, and sign-off on the review. If the physician detected any abnormalities, then the patient would be notified by either the physician or HealthNet support staff. If the physician did not detect any abnormalities, then the physician would sign the attached billing sheet and give the billing sheet

---

[1] McKinney, Dawn, et al., "State Policy Report #40: 2011 Update on the Status of the Medicaid Prospective Payment System in the States," NATIONAL ASSOCIATION OF COMMUNITY HEALTH CENTERS, accessed at http://www.nachc.com/client//2011%20PPS%20Report%20SPR%2040.pdf

to the individual in each clinic who processed the claims. This procedure was employed regardless of whether the patient was high-risk or a normal pregnancy.

25. The physician who reviewed the ultrasound did not see the patient face-to-face in association with the ultrasound review. However, each ultrasound review was billed to Medicaid and subsequently submitted for an FQHC wrap-around payment as though a face-to-face encounter with the physician occurred.

26. Trainor and former HealthNet COO Elvin Plank routinely referred to the ultrasound review claims model as a "cash cow." Trainor specifically explained to Dr. Robinson that, "ultrasounds are reimbursed at the wrap-around rate and don't need to take away a provider from their usual work." Trainor stated to Dr. Robinson that this enabled HealthNet to "get the biggest bang for [its] buck."

27. In 2011, Trainor sent an email to Dr. Robinson which stated that, with the wrap-around payment, Medicaid paid HealthNet the same for a patient visit as an ultrasound read that the physician could do between scheduled patients, before patient, during lunch or at the end of the day – all times which would indicate that the physician would not have a face-to-face encounter with the patient while reading the ultrasound. Trainor touted this as a benefit to the physician, because the ultrasound reads would be counted towards the physician's monthly productivity.

> **From:** Trainor, Donald
> **Sent:** Sun 2/13/2011 1:32 PM
> **To:** Robinson, Judith A; Thomas, Booker; Plank, Elvin
> **Cc:** Flick, Lawrence T
> **Subject:** Re: important question
>
> Thank you, Judy.
>
> Baseline MD productivity expectations after the 1st year working at HN are 2.75 pts/hr. averaged over the course of a month. This works out to ~8.25 pts. In a 3 hour morning and 11 pts. In a 4 hour afternoon, or ~19.25 pts. in a 7 hour pt. encounter day at one of our outpatient centers. A bonus for our Ob/Gyn Physicians at the locations where we have ultrasound equipment is that, since Medicaid pays HN the same as a pt. visit with our wrap around payment, we count U/S's read toward those Physicians productivity for the month and they are paid additionally each month for reading those U/Ss between their scheduled pts. and/or before pt. care, during lunch or at the end of the day. A bit complicated but the basic message should be an ave. of 2.75 pts/day for Physicians which equates to 19-20 pts./day.
> CNM & NPs target is lower at 2.4 pts./hr. in part because of their lower salaries and breadth of knowledge which works out to ~17 pts/day.
>
> Hope this helps & thanks for asking. Don

28. Additionally, nonphysicians routinely performed services which did not require physician oversight, such as the administration of a monthly Depo-Provera birth control injection. A patient presenting for a monthly Depo-Provera shot would be placed on a provider's schedule, but only a medical assistant ever saw the patient to administer the injection. However, Trainor explained to Dr. Robinson that the service would be billed under the name of whatever physician was in the building at the time the injection was administered. As a result, a bill was submitted for the injection in the physician's name without the physician having a face-to-face encounter with the patient.

29. In July 2008, Trainor circulated an email to Dr. Robinson and other HealthNet staff members which described the policy for billing encounters which did not involve a physician face-to-face visit with a patient.

> **From:** Trainor, Donald
> **Sent:** Mon 7/28/2008 2:40 PM
> **To:** Ashworth, Mickki; Robinson, Judith A
> **Cc:** Glenn, Lorie; Plank, Elvin; Flick, Larry T
> **Subject:** FW: New 99211 policy

....

> H.  While the 99211 visit does not require the actual face-to-face encounter between a patient and the physician, it is billed under the name of the supervising physician or provider on-site for that encounter."
>
> One very unique thing about HealthNet billing as an FQHC is that we get "wrap-around" payments for our Medicaid visits such that **all Medicaid visits are paid the same to us by the State by Federal mandate**. So, regardless of what provider billing code that is used, we are **paid the same >$100 amount** whether it is a 99211, 99215, 99201, 99205, etc. So that is why we want to be sure that we are billing appropriate "nurse" visits that meet the above guidelines and bill for these encounters as 99211 and we do not have to have a provider actually see the patient for these appropriately billed 99211 visits.
>
> Hope this helps.
>
> Thanks. Don

30.  The financial compensation available to an FQHC facility is provided only for an "encounter" which requires that an approved clinic practitioner (which does not include a medical assistant) see a patient face-to-face. Specifically, a physician's face-to-face meeting with a patient could be billed under the physician's name, or a nurse practitioner's face-to-face meeting with a patient could be billed in the nurse-practitioner's name. But, if a medical assistant performs a service for a patient, the service cannot be billed to an FQHC as though a physician had the face-to-face encounter with a patient. Therefore, each claim made for FQHC reimbursement for the review of ultrasounds, a birth control injection, or other service which did not involve a face-to-face visit by an approved clinical practitioner is a false claim which resulted in an improper claim to Medicaid and a false claim for an FQHC wrap-around payment.

31. It has been determined by the State of Indiana and the United States of America the wrap-around claims described above were materially false and the Plaintiff's original action was the foundation for the recovery received by the State of Indiana and the United States of America.

32. When the Plaintiff's original action was not dismissed, the wrap-around claims described above, the wrap-around claims had not been reconciled and the value of those claims could not be ascertained. The parties were awaiting a reconciliation of the above wrap-around claims to determine the value of the Plaintiff's (Relator's) share. There was an agreement between the parties the Plaintiff's claims regarding the wrap-around would be dismissed once the value of those claims had been ascertained and the Plaintiff was paid a relator's share.

33. It was also previously agreed the Plaintiff's original lawsuit was the foundation and cause of the recovery recognized by the State of Indiana and/or the United States of America.

34. It was previously agreed the value of the Plaintiff's services as a relator were substantial and she was entitled to a relator's share of 27.5 percent of any recovery.

35. The value of the above wrap-around claims has been ascertained but the State of Indiana and the United States of America refuse to pay the Plaintiff, a 27.5 percent (relator's share) of their respective recovery.

**Count I:**
**Violations of the Federal False Claims Act by Submitting Claims for Reimbursement for FQHC Payments Without Conducting a Face-to-Face Encounter *as to Defendant HealthNet***

36. Relator incorporates paragraphs 1 - 31 of this complaint as though fully set forth herein. This count sets forth claims for treble damages and forfeitures under the federal False Claims Act, 31 U.S.C. §§ 3729-3732, as amended.

37. As an FQHC, HealthNet was entitled to submit claims for additional "wrap-around" payments in addition to the standard Medicaid reimbursement for certain services, so long as the service was rendered during a patient "encounter" which required face-to-face interaction between the physician and patient. By submitting claims for wrap-around payments which required that a physician have a face-to-face encounter with the patient, when Defendant knew that the physician did not have a face-to-face encounter, Defendant HealthNet submitted false and fraudulent claims for reimbursement.

38. Defendants knowingly submitted false claims to the State of Indiana as a result of this conduct. Defendants knew that submitting the false claim to the State of Indiana would, in turn, cause the State of Indiana to submit a claim for reimbursement to the federal Medicaid program.

39. In doing so, Defendant knowingly violated:

(1) 31 U.S.C. § 3729(a)(1)(A) by presenting, or causing to be presented, false and fraudulent claims for payment or approval to the United States, in the form of claims for reimbursement as an FQHC related to review of ultrasounds without a face-to-face patient encounter, and

(2) 31 U.S.C. § 3729(a)(1)(B) by making, using or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States by submitting bills which certified a proper face-to-face encounter occurred.

40. To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relator alleges that Defendant knowingly violated 31 U.S.C. § 3729(a)(1) and 31 U.S.C. §

3729(a)(2), prior to amendment, by engaging in the conduct described in Paragraph 139(1) and (2), respectively.

41. Because of the false or fraudulent claims made by Defendant, the United States of America has suffered damages and is therefore entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation, and the Plaintiff seeks a recovery for her substantial efforts to bring about a recovery for the United States of America.

**Count II:
Violations of the Indiana False Claims Act by Submitting Claims
for Reimbursement for FQHC Payments Without Conducting
a Face-to-Face Encounter *as to Defendant HealthNet***

42. Relator incorporates paragraphs 1 - 31 of this complaint as though fully set forth herein. This count sets forth claims for treble damages and forfeitures under the Indiana False Claims Act, Ind. Code 5-11-5.5.

43. As an FQHC, HealthNet was entitled to submit claims for additional "wrap-around" payments in addition to the standard Medicaid reimbursement for certain services, so long as the service was rendered during a patient "encounter" which required face-to-face interaction between the physician and patient. By submitting claims for wrap-around payments which required that a physician have a face-to-face encounter with the patient, when Defendant knew that the physician did not have a face-to-face encounter, Defendant HealthNet submitted false and fraudulent claims for reimbursement.

44. Defendant knowingly submitted false claims to the State of Indiana as a result of this conduct.

45. In doing so, Defendant knowingly violated:

(1) Ind. Code 5-11-5.5-2(b)(1) by presenting a false claim to the state for approval; and

(2) Ind. Code 5-11-5.5-2(b)(2) by making or using a false record or statement to obtain payment or approval of a false claim from the state.

46. Because of the false or fraudulent claims made by Defendant, the State of Indiana has suffered damages and is therefore entitled to recovery as provided by the Indiana False Claims Act of an amount to be determined at trial, plus a civil penalty of at least $5,000 and up to three times the amount of damage sustained by the state and the Plaintiff seeks a relator's share for her substantial efforts in bringing about a recovery for the State of Indiana.

### Count III.
### Enforce Prior Agreement, Approve Settlement and Order Payment of Relator's Share

47. Relator incorporates paragraphs 1-46 of this complaint as though fully set forth herein.

48. As described in paragraphs 32-35, an agreement was reached among the parties whereby the State of Indiana and/or the United States of America would pay to the Plaintiff a relator's share (27.5%) of the recovery realized by the State of Indiana and/or the United States of America for their respective recoveries.

49. Prior to filing this action, HealthNet represented on multiple occasions they were preparing a written settlement agreement to resolve the controversy regarding the above described wrap-around claims.

50. Therefore, it is anticipated there will be a complete resolution of the above-described wrap-around claims once HealthNet has been served. If such an agreement is produced and tendered to the Court, the remaining issue is to approve the agreement, determine

the Plaintiff's relator's share and order the State of Indiana and/or the United States of America to pay the relator's share.

52. Should HealthNet not follow through with a written settlement agreement and/or attempt to withdraw from the previous oral agreement, the matter should be set to enforce the terms of the oral agreement and determine the Plaintiff's relator's share and order the State of Indiana and/or the United States of America to pay the relator's share.

53. Alternatively, if the State of Indiana and/or the United States of America seek to dismiss this action with prejudice, the Court should set the matter for a fairness hearing to determine the relator's share.

**WHEREFORE,** the Plaintiff requests the Court to use its equitable powers to enforce the term of a previous settlement agreement regarding the above-described wrap-around claims, award the Plaintiff a Relator's share, order the State of Indiana and/or the United States of America to pay the relator's share, costs, interest, attorneys' fees and for all other just and proper relief.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Dr. Judith Robinson demands a trial by jury on all issues so triable.

Respectfully submitted this 17th day of October, 2019.

_(signature)_

Robert E. Saint
rsaint@ewnc-law.com
Of counsel:
EMSWILLER, WILLIAMS, NOLAND & CLARKE, P.C.
8500 Keystone Crossing, Suite 500
Indianapolis, IN 46240
Phone: 317-475-4469
Fax:    317-257-8787
*Counsel for Relator Dr. Judith Robinson*

The foregoing Complaint was not served on any Defendant pursuant to 31 U.S.C. § 3730(b)(2) or until further order of the Court.

_(signature)_
Robert E. Saint